IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84945-0-I |
| Respondent, | DIVISION ONE |
| v. | |
| JOSHUA GRAHAM REED, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, J. — In 2016, five-year-old P.T. told her caregiver that her mother's ex-boyfriend, Joshua Reed, had touched her inappropriately. P.T. reiterated her statement when interviewed by CPS. Reed denied ever inappropriately touching P.T. The State charged Reed with first degree rape of a child, first degree molestation, and witness tampering. Reed waived his right to a jury trial and the court found Reed guilty on all counts.

Reed appeals, asserting that insufficient evidence exists under the corpus delicti rule, that his community custody conditions must be stricken, and that the no-contact order exceeds the statutory maximum and violates his fundamental right to parent.

We affirm the conviction for child molestation in the first degree but remand for the court to modify community custody conditions, no-contact order, and fees.

## FACTS

### Background

In April 2016, then five-year-old P.T. lived with her caretaker, Angela Fitzgerald. Following P.T.'s rough behavior with another child, Fitzgerald sat her down for a conversation about "no" meaning "no." When Fitzgerald stated that this applied to adults as well as children, P.T. disclosed that her mother's boyfriend, Joshua Reed, had touched her inappropriately. Using her arm as an example of a body, with her shoulder representing the head and her hand representing the feet, Fitzgerald asked P.T. to show her where Reed had touched her. P.T. pointed to Fitzgerald's elbow, which Fitzgerald understood to mean P.T.'s genitals. Although Fitzgerald did not ask many questions, she was left with the impression that the incident involved penetration. P.T. also told Fitzgerald, unprompted, that Reed threatened her and instructed her not to tell anyone. Fitzgerald reported P.T.'s statements to other family members and a child advocacy center, who then contacted Child Protective Services (CPS).

### CPS Investigation and Interviews

CPS began its investigation in April 2016. Brandy Johannesson, a CPS investigator, interviewed P.T., her mother, Lola Higby, Fitzgerald, and Reed. The investigation revealed that P.T. had previously informed her mother, and grandmother, Dorothy Higby, of the inappropriate behavior but that neither had taken any action.[1]

---

[1] We refer to Lola Higby and Dorothy Higby by first name for the purpose of clarity.

Lola stated P.T. told her Reed had raped her while Reed, Lola, and P.T. lived together. She also noted that P.T. repeated the statement six months later. Lola and P.T. continued to live with Reed after the first disclosure. Lola did not ask P.T. any questions about what specifically happened or report the behavior.

Dorothy recounted that, out of the blue, P.T. had stated she had been raped. Dorothy did not think much of it until P.T. reiterated her statement the following day, noting that she was hurting and asking to take a bath. While P.T.'s description of being raped in a bathtub caused Dorothy concern, she did not ask any questions and continued on to work. She did not report P.T.'s statements or take any other action.

During her interview, P.T. was initially hesitant to discuss Reed. But as P.T. became more comfortable, she again stated that Reed had raped her. When asked whether she could say a little more about that, P.T. described being dropped off with Reed, despite asking her mother not to do so. She recounted being on the couch when Reed removed his pants, pulled down her pants and underwear, and inserted his penis into her vagina. She slammed her crayon on the counter to explain how it felt.

Reed detailed two incidents in his interview with CPS but denied any inappropriate contact. He described both incidents as "being the one that is there at the wrong place at the wrong time." The first involved helping P.T. prepare for a bath. Reed stated that after calling to get his attention, P.T. presented herself to him naked. She was three years old at the time.

Reed also described a time that P.T. ran into the bedroom he shared with her mother, climbed under the blankets, and grabbed his penis. He stated that she said "wow," before he eventually shooed her out of the room. He denied ever raping P.T. and did not address P.T.'s description of the incident on the couch.

### Law Enforcement Investigation and Interviews

Law enforcement also undertook an investigation in April 2016, following a CPS referral. Detective Ken Gates interviewed Reed the same day he spoke with CPS. Both the audio recording and the transcript of the recording were admitted into evidence.

Reed again discussed two incidents while speaking with Detective Gates: the bathroom incident and the bedroom incident. He described, in greater detail, a time that he helped make sure P.T. got in the bath. He detailed how she called him into the bathroom several times and then stood up so as to "entice" him. He suggested that she was "presenting herself," essentially saying "you should come in here." Reed described saying "no thank you," before leaving the bathroom. He again acknowledged that P.T. was only three years old.

Reed also described the bedroom incident, stating that P.T. often entered the bedroom that he and Lola shared while they were still in bed. He detailed the particular circumstance where P.T. waited until Lola left the bedroom before running into the room, diving under the covers, and "[trying] to help herself." He clarified that "help[ing] herself" meant that she grabbed his penis. He reiterated that she said both "wow," and "I wanna do what my mom wants to do, you know

4

what my mom does." He further provided that, at three years old, she was "old enough to know what it is, and what she should be using it for, or have a good idea."

When Detective Gates informed Reed that P.T. stated he had touched her inappropriately, Reed asserted he had never gone out of his way to inappropriately conduct himself around P.T., emphasized that the two incidents he discussed involved P.T. as the actor, and denied the rape claim.

Detective Gates also spoke with Georgina Winters, Reed's ex-partner and the mother of his children. Winters stated that Reed had previously disclosed the bedroom incident to her. Winters also informed Detective Gates that Reed asked her to say she was with him when the alleged crime occurred.

<u>Trial</u>

The State charged Reed with one count of rape of a child in the first degree in May 2016. The State amended the information to add one count of witness tampering as to Winters. The State then again amended the information, adding one count of child molestation in the first degree. Reed waived his right to a jury and proceeded to a bench trial in July 2017.

In lieu of presenting certain oral testimony, the parties stipulated to the admission of the medical report resulting from P.T.'s physical examination, the recordings of her child forensic interview, and Reed's law enforcement interview. Reed still testified as part of the defense case, specifically addressing the sexual abuse allegations.

When asked whether he recalled any inappropriate contact during the bedroom incident, Reed replied yes, but denied any sexual contact with P.T. He explained he believed P.T. might have accidentally touched his genitals, but stated she did not purposely try to touch him for sexual purposes. Although he did not challenge his statements to law enforcement, Reed did dispute the meaning behind his statements. He attempted to explain away his language referencing P.T.'s "enticement" and otherwise allegedly intentional actions. But he nonetheless acknowledged that his testimony at trial was fundamentally the same as his initial statements to law enforcement.

The trial court denied defense counsel's request to dismiss the rape and molestation charges for insufficient evidence and found Reed guilty on all three counts. The court concluded that the incidents giving rise to the rape and molestation charges "involve[d] distinct criminal acts," that Reed and P.T.'s aligning testimony constituted evidence of sexual contact, and that the discrepancies in Reed's testimony affected his credibility.

The court sentenced Reed to an indeterminate sentence of 96 months to life on the child molestation charge, 171 months to life on the rape of a child charge, and 12 months for witness tampering. The court also imposed community custody conditions requiring that Reed engage in chemical dependency evaluations, polygraph examinations, and home visits, as well as limiting his contact with minors. Following a motion from the State, the court extended the prohibition on any contact with P.T., as well as the prohibition on

contact with minors including Reed's biological son, from 36 months to life.  Reed appeals.

ANALYSIS

Sufficient Evidence under Corpus Delicti

Reed asserts that, under the corpus delicti rule, the State failed to present sufficient evidence to corroborate the child molestation charge, independent of Reed's own incriminating statements.  Accordingly, he claims his statements should not have been admitted and considered in determining guilt.  The State disagrees, maintaining that the State's evidence and Reed's testimony in court were sufficient to corroborate that child molestation occurred in an act separate and distinct from the child rape.  Because a prima facie case is a low evidentiary standard and the court relied on sufficient evidence to establish the molestation charge, we agree with the State.

"A criminal defendant may raise corpus delicti for the first time on appeal as a sufficiency of the evidence challenge."  *State v. Cardenas-Flores*, 189 Wn.2d 243, 247, 401 P.3d 19 (2017).  We review such challenges de novo. *State v. Green*, 182 Wn. App. 133, 143, 328 P.3d 988 (2014).  In evaluating the sufficiency of the evidence, the reviewing court accepts the truth of the State's evidence and draws all reasonable inferences therefrom in the light most favorable to the State.  *Cardenas-Flores*, 189 Wn.2d at 264.

Corpus delicti, meaning "the 'body of the crime,' " serves to prevent convictions based solely on confessions.  *State v. Troutman*, 30 Wn. App. 2d 592, 601, 546 P.3d 458, *review denied*, 3 Wn.3d 1016 (2024) (quoting *State v.*

*Brockob*, 159 Wn.2d 311, 327, 150 P.3d 59 (2006)).  Corpus delicti includes two elements: (1) an injury or loss (2) caused by another's criminal act.  *Cardenas-Flores*, 189 Wn.2d at 264.  Both " 'must be proved by evidence sufficient to support the inference that' a crime took place."  *Cardenas-Flores*, 189 Wn.2d at 252 (quoting *Brockob*, 159 Wn.2d at 327-28).  "[A] defendant's confession 'alone is not sufficient to establish that a crime took place.' "  *Cardenas-Flores*, 189 Wn.2d at 252 (quoting *Brockob*, 159 Wn.2d at 327-28).  Rather, independent evidence must corroborate or confirm a defendant's confession.  *Troutman*, 30 Wn. App. 2d at 601.

That said, " 'the independent evidence need not be of such a character as would establish the corpus delicti beyond a reasonable doubt, or even by a preponderance of the proof.  It is sufficient if it prima facie establishes the corpus delicti.' "  *Cardenas-Flores*, 189 Wn.2d at 258 (emphasis omitted) (quoting *State v. Meyer*, 37 Wn. 2d 759, 763-64, 226 P.2d 204 (1951)).  " 'Prima facie corroboration . . . exists if the independent evidence supports a logical and reasonable inference of the facts the State seeks to prove.' "  *Cardenas-Flores*, 189 Wn.2d at 258 (alteration in original) (internal quotation marks omitted) (quoting *Brockob*, 159 Wn.2d at 328).

To convict a defendant of child molestation in the first degree, the State must prove the defendant had sexual contact with someone under the age of 12, that they were not married, and that the defendant is at least 36 months older than the victim.  RCW 9A.44.083(1).  "Sexual contact" includes "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying

8

sexual desire of either party or a third party." RCW 9A.44.010(13). The defendant need not have caused the contact to establish sexual contact. *State v. Gary J.E.*, 99 Wn. App. 258, 265, 991 P.2d 1220 (2000).

Therefore, to establish the corpus delicti of child molestation in the first degree, the State must present evidence of sexual contact between the defendant and the victim beyond the defendant's confession. *State v. Ray*, 130 Wn.2d 673, 679, 926 P.2d 904 (1996).

Reed claims that the State failed to do so because it presented no evidence, outside of Reed's own statements, to indicate he had sexual contact with P.T. at a time and place separate from the facts giving rise to the charge of rape of a child in the first degree. We disagree.

P.T., Lola, and Fitzgerald all provided corroborating evidence indicating that Reed had sexual contact with P.T. distinct from the rape. This alone is enough to establish the charge of child molestation.

Additionally, *State v. Mathis*, 73 Wn. App. 341, 869 P.2d 106 (1994), provides that this court may rely on Reed's substantive testimony at trial in considering whether the State established the corpus delicti. Reed's testimony then further strengthens the child molestation conviction.

In *Mathis*, the court relied in part on the defendant's testimony during the defense case because he did not challenge the corpus delicti until after he testified. 73 Wn. App. at 346-47. While ordinarily, a court would not have any defendant testimony when determining whether the State has established the

9

corpus delicti of the crime, in such a circumstance, it is "appropriate" for the court to consider all of the evidence before it. *Mathis*, 73 Wn. App. at 347.

Reed did not raise a corpus delicti challenge until appeal. Accordingly, this court may consider his testimony at trial in determining whether the State established the corpus delicti of child molestation in the first degree.

Reed's trial testimony, Lola's trial testimony, Fitzgerald's trial testimony, and P.T.'s CPS interview establish prima facie child molestation in the first degree.

Reed's "confession," for the purposes of corpus delicti, detailed how P.T. entered the bedroom Reed shared with her mother, "dove in [under the covers], and tried to help herself." Reed clarified that P.T. touched his penis.

Lola, Fitzgerald, and P.T. then all corroborate Reed's testimony and "confession." Before the rape, P.T. asked her mother not to leave her with Reed, suggesting she was already uncomfortable in his care. The trial court explicitly found P.T.'s statements and testimony to be credible. She also told her mother about an incident that happened in a bed. Lola testified that they continued to live with Reed after that first disclosure. P.T. also informed Fitzgerald that Reed had molested her while Reed, Lola, and P.T. were still living together.

This testimony both establishes the molestation incident and distinguishes it from the rape. In describing the rape, P.T. repeatedly stated that they were on a couch, not a bed. She also emphatically stated that she had not seen Reed since the rape, while the molestation occurred while she still lived with him.

Again, corpus delicti requires only prima facie corroboration, supporting a logical and reasonable inference of the facts the State seeks to prove. Taking the State's evidence as true and drawing all reasonable inferences therefrom, P.T., Lola, and Fitzgerald's testimony documenting contact while Reed still lived with Lola and P.T. support the reasonable inference that Reed molested P.T. As Lola emphasized that Reed did not bathe P.T., inferring that any contact with sexually intimate body parts was done for the purpose of sexual desire is reasonable. Together, P.T., Lola, and Fitzgerald's testimonies are enough to establish prima facie corroboration as required by corpus delicti.

Considering Reed's testimony at trial then adds to P.T., Lola, and Fitzgerald's corroboration. At trial, Reed testified about the same event, referencing P.T. climbing under the bedsheet and making contact. In fact, Reed testified that his initial description of the event was fundamentally the same as what he testified to in court.

Given the low evidentiary standard and the provided testimony, sufficient evidence establishes the corpus delicti of child molestation in the first degree.

<u>Community Custody Conditions</u>

Reed next argues that several of his community custody conditions, including chemical dependency evaluations, home visits to monitor compliance, the prohibition on contact with minors, and polygraph requirements, must be stricken because they are not crime-related, are insufficiently narrowly tailored, or are unconstitutional. The State contends that Reed invited any error in the imposition of the challenged community custody conditions, except as to limiting

his contact with children, by asking the court to adopt the conditions. As to the prohibition on contact with minors, the State asserts that Reed fails to demonstrate that review is appropriate because he did not provide the trial court with any information allowing it to make another decision.

An appellant may raise constitutional challenges to community custody conditions for the first time on appeal. *State v. Reedy*, 26 Wn. App. 2d 379, 395, 527 P.3d 156, *review denied*, 1 Wn.3d 1029 (2023). We review community custody conditions for an abuse of discretion. *State v. Wallmuller*, 194 Wn.2d 234, 238, 449 P.3d 619 (2019). Although, generally, courts need not consider claims that were invited or waived, the invited error doctrine does not preclude review of an unauthorized sentence. *State v. Casimiro*, 8 Wn. App. 2d 245, 249, 438 P.3d 137 (2019); *State v. Mercado*, 181 Wn. App. 624, 631, 326 P.3d 154 (2014).

The invited error doctrine " 'precludes a criminal defendant from seeking appellate review of an error [they] helped create, even when the alleged error involves constitutional rights.' " *State v. Bennett*, 32 Wn. App. 2d 32, 41, 553 P.3d 1150 (2024) (alteration in original) (internal quotation marks omitted) (quoting *State v. Tatum*, 23 Wn. App. 2d 123, 128, 514 P.3d 185 (2022)). A petitioner invites error if they affirmatively assented to, materially contributed to, or benefitted from the error. *Mercado*, 181 Wn. App. at 630. "To be invited, the error must be the result of an affirmative, knowing, and voluntary act." *Mercado*, 181 Wn. App. at 630. Failure to object does not invite error. *Tatum*, 23 Wn. App.

12

at 128. The State bears the burden of proving invited error. *Mercado*, 181 Wn. App. at 630.

Sentencing courts may impose and enforce crime-related prohibitions and affirmative requirements as a condition of community custody. *State v. Martinez Platero*, 17 Wn. App. 2d 716, 725-26, 487 P.3d 910 (2021). But there must be "a reasonable relationship between the condition and the defendant's behavior." *Martinez Platero*, 17 Wn. App. 2d at 726.

The State asserts that Reed's challenges to the chemical dependency evaluation, polygraph examinations, and home visits are not subject to review because Reed invited any error in requesting that the court adopt them. We disagree.

Defense counsel's statement apparently referencing the community custody conditions does not explicitly assent to the imposition of those conditions. And Reed's failure to object does not rise to the level of invited error.

*Casimiro* is instructive as to defense counsel's language. 8 Wn. App. 2d at 248. When asked specifically if Casimiro objected "to any conditions found in appendix F," counsel "review[ed] the appendix, indicated he was familiar with the conditions, and advised the court that 'we are not objecting to these.' " *Casimiro*, 8 Wn. App. 2d at 248. Here, counsel's language is significantly less clear. When requesting a sentence at the lower end of the sentencing scale, Reed stated "the additional requirements that are asked for would help with [keeping P.T. safe] as well, and Mr. Reed has no problem with any of those and the Court should adopt those." Not prompted by a direct question from the court, there is no such clear

reference to the community custody conditions proposed by the prosecution. Additionally, counsel had just requested that Reed be allowed contact with his biological son. To then immediately agree to conditions limiting that contact is contradictory and makes little sense. Defense counsel's language here does not rise to the level of affirmative assent as required.

Without inferring affirmative assent, all that remains is Reed's failure to object to the community custody conditions. But that similarly does not rise to the level of invited error. As defense counsel's statement that "Reed has no problem with any of those" is more akin to failure to object to a potential error than affirmative invitation of one, Reed did not invite error.

Because we conclude that Reed did not invite error, we now consider Reed's challenges to the community custody conditions.

1. Chemical Dependency Evaluation

Reed contends that the community custody condition requiring that he complete a chemical dependency evaluation and comply with recommended treatment is improper because the condition is not sufficiently related to his behavior. We agree.

Under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, a trial court may order an offender to obtain a chemical dependency evaluation and comply with recommended treatment only if it determines that the offender has a chemical dependency that contributed to their offense. RCW 9.94A.607(1).

Here, the trial court did not find that Reed had a chemical dependency that contributed to his offense. In fact, the record provides no evidence that drugs or

alcohol played any role in Reed's convictions. Without such a finding, the trial court exceeded its statutory authority in imposing the chemical dependency condition. We remand for the trial court to strike the condition.

    2.  Polygraph Examination

Reed next asserts that the condition requiring he submit to polygraph examinations must be limited to monitoring compliance with other community custody conditions to be sufficiently narrowly tailored. We again agree.

Polygraph testing may be used during community custody to monitor reasonable progress with treatment or other conditions of community supervision. *State v. Combs*, 102 Wn. App. 949, 952, 10 P.3d 1101 (2000). But such polygraph testing may not be used "as a fishing expedition to discover evidence of other crimes, past or present." *Combs*, 102 Wn. App. at 953. In *Combs*, the trial court ordered that Combs submit to unlimited polygraph testing to monitor his compliance. 102 Wn. App. at 952. The appellate court upheld the condition, determining that the language of the judgment and sentence as a whole impliedly limited the scope, but stated that Comb's judgment and sentence should have "explicitly contained" monitoring compliance language. *Combs*, 102 Wn. App. at 953.

Reed's judgment and sentence provide only that he must "submit to polygraph examination as required by the Department of Corrections [(DOC)]." In contrast to *Combs*, the judgment and sentence as a whole does not impliedly limit the scope of the polygraph examinations. Rather, the language remains improperly broad.

We remand for the trial court to limit the polygraph examinations specifically to compliance with other community custody conditions.

3. <u>Home Visits</u>

Reed also maintains that the condition requiring that he submit to home visits to monitor compliance permits unlawful searches in violation of article I, section 7 of the Washington Constitution. Beyond invited error, the State's only response is to argue the issue is not ripe for review. A pre-enforcement challenge to community custody conditions is ripe for review when " 'the issues raised are primarily legal, do not require further factual development, and the challenged action is final.' " *State v. Nelson*, 4 Wn.3d 1009, 565 P.3d 906, 913 (2025) (internal quotation marks omitted) (quoting *State v. Cates*, 183 Wn.2d 531, 534, 354 P.3d 832 (2015)). "Further factual development is needed when the challenger's argument is based on the potential for '[s]ome future misapplication of the community custody condition,' which necessarily depends 'on the particular circumstances of the attempted enforcement.' " *Nelson*, 565 P.3d at 913 (alteration in original) (internal quotation marks omitted) (quoting *Cates*, 183 Wn.2d at 534).

Occasionally, the risk of hardship to a defendant may justify review of a challenge before it is factually developed. *Nelson*, 565 P.3d at 914. That risk is greatest when the challenged conditions " 'immediately restrict[] the petitioners' conduct upon their release from prison.' " *Nelson*, 565 P.3d at 914 (alteration in original) (quoting *State v. Sanchez Valencia*, 169 Wn.2d 782, 239 P.3d 1059 (2010)). A risk of hardship is insufficient to justify review, however, when

16

complying with challenged conditions does not require the defendant to do, or refrain from doing, anything upon release unless and until the State requests it. *Nelson*, 565 P.3d at 914.

Here, Reed's home visit condition does not require him to do, or refrain from doing, anything upon his release unless and until the DOC requests it. Therefore, Reed's challenge requires further factual development to determine if the circumstances of enforcement of the home visit condition are unreasonable. We conclude that the issue is not ripe.

4. <u>Fundamental Right to Parent</u>

Lastly, Reed asserts that four of the community custody conditions, those prohibiting contact with minors, violate his fundamental right to parent. The State disagrees, contending that Reed failed to present any information about his biological children such that the court had any basis to make a different decision. Because the trial court did not conduct an on-the-record analysis determining whether the conditions were reasonably necessary to protect the State's compelling interest in preventing harm, we remand for the court to do so.

Courts recognize that prohibiting an individual's contact with minors is logical when their offense involved a minor. *State v. Riles*, 135 Wn.2d 326, 350, 957 P.3d 655 (1998), *abrogated on other grounds by Valencia*, 169 Wn.2d 782. That said, parents have a fundamental liberty interest in the custody and care of their children. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 574, 257 P.3d 522 (2011). Sentencing courts may restrict fundamental parenting rights by conditioning a criminal sentence, but only if the condition is reasonably

17

necessary to further the State's compelling interest in preventing harm and protecting children. *State v. Corbett*, 158 Wn. App. 576, 598, 242 P.3d 52 (2010). Subject to strict scrutiny, the conditions must be narrowly drawn and "[t]here must be no reasonable alternative way to achieve the State's interest." *State v. Warren*, 165 Wn.2d 17, 34, 195 P.3d 940 (2008). The court must conduct this inquiry on the record. *State v. DeLeon*, 11 Wn. App. 2d 837, 841-42, 456 P.3d 405 (2020), *see also In re Pers. Restraint of Rainey*, 168 Wn.2d. 367, 382, 229 P.3d 686 (2010).

Each of the four community custody conditions limit his contact with minors. In imposing the conditions, however, the trial court did not address Reed's fundamental right to parent. Nor did the court explain, on the record, whether the no-contact conditions were reasonably necessary to achieve the State's compelling interest in preventing harm. Moreover, the court did not document any consideration as to whether less restrictive alternatives existed to achieve the State's interest. Given this lack of documentation, we remand for the trial court to conduct the required analysis on the record.

No-Contact Order

1. Statutory Maximum

Reed states that the no-contact order between Reed and Winters exceeds the statutory maximum for witness tampering and is therefore unlawful on its face. The State agrees. We remand for the trial court to limit the no-contact term to five years.

A trial court's authority to impose sentencing conditions is statutory. *In re Postsentence Review of Leach*, 161 Wn.2d 180, 184, 163 P.3d 782 (2007). Sentencing provisions outside the authority of the trial court are unlawful. *State v. Pringle*, 83 Wn.2d 188, 190, 517 P.2d 192 (1973). Erroneous or otherwise unlawful sentences may be challenged for the first time on appeal. *Bahl*, 164 Wn.2d at 744.

Under RCW 9.94A.505, a trial court may impose no-contact orders with victims as a crime-related prohibition as long as the no-contact period does not exceed the statutory maximum sentence. *State v. Armendariz*, 160 Wn.2d 106, 108, 120, 156 P.3d 201 (2007). RCW 9.94A.030(50) defines "statutory maximum sentence" as "the maximum length of time for which an offender may be confined as punishment for a crime." Witness tampering is a class C felony. RCW 9A.72.120(2). The statutory maximum sentence for a class C felony is five years. RCW 9A.20.021(1)(c).

Here, the no-contact order prohibits Reed from contact with Winters for "20 years/life" and from coming within 500 feet of Winter's home, work, or school "until October 4, 2037." As both exceed the statutory maximum sentence for witness tampering, the no-contact order is unlawful. We remand for the trial court to limit the no-contact order to the statutory maximum sentence of five years.

2. Fundamental Right to Parent

Reed also argues that, as he and Winters share a son, this court must modify the no-contact order to allow for contact as part of a court process. The

State first asserts that Reed waived this issue by failing to raise it below.  The State then notes that Reed is precluded from contact with his son at this time and therefore any need for contact with Winters would be unlikely.  We conclude that Reed does establish manifest constitutional error and may raise the issue for the first time on appeal and that the no-contact order does violate Reed's fundamental right to parent.

Generally, we do not consider issues raised for the first time on appeal.  RAP 2.5(a).  But a party may raise an issue for the first time on appeal if it addresses a lack of jurisdiction, failure to establish facts upon which relief can be granted, or a manifest constitutional error.  RAP 2.5(a)(1)-(3).  A party demonstrates manifest constitutional error by showing that the issue affects their constitutional rights and that they suffered actual prejudice as a result.  *State v. Anderson*, 31 Wn. App. 2d 668, 675, 552 P.3d 803, *review denied,* 3 Wn.3d 1034 (2024).  To establish actual prejudice, the party must make a " 'plausible showing . . . that the asserted error had practical and identifiable consequences in the trial of the case.' "  *Anderson*, 31 Wn. App. 2d at 675 (alterations in the original) (internal quotation marks omitted) (quoting *State v. Guevara Diaz*, 11 Wn. App. 2d 843, 851, 456 P.3d 869 (2020)).

Again, parents have a fundamental liberty interest in the custody and care of their children.  *K.N.J.*, 171 Wn.2d at 574.  "Parentage disputes implicate the fundamental right a parent has to autonomy in child-rearing under the Fourteenth Amendment."  *In re Parentage of A.H.*, 28 Wn. App. 2d 412, 421, 536 P.3d 719 (2023).  So as not to infringe on that right, a no-contact order that prohibits

contact with a parent must still allow for contact through the court or counsel sufficient to allow the other parent to seek contact with their shared children. *State v. McGuire*, 12 Wn. App. 2d 88, 90, 456 P.3d 1193 (2020).

Reed establishes both that the issue affects his constitutional rights and that he suffered actual prejudice. In limiting his ability to contact Winters completely, the no-contact order prevents Reed from pursuing any parenting plan action in family court concerning their shared child. This clearly interferes with his fundamental right to autonomy in raising his son. It also displays the no-contact order's identifiable consequences: restricting Reed's ability to contact his son.

The State contends that Reed cannot establish prejudice because the court already prohibited contact with his son. But as we remand the community custody condition limiting that contact, this may no longer be true. Nor is the test whether "it is unlikely that Reed would need to contact Winters."

Reed establishes manifest constitutional error. And because the order provides no exception for contact through court or counsel, it violates Reed's fundamental right to parent.

Fees and Interest on Restitution

Reed lastly contends that the victim penalty assessment (VPA), DNA collection fee, court costs, criminal filing fee, jury demand fee, and community supervision fees should be stricken based on his indigency. He also asserts that remand is appropriate to strike interest on any restitution ordered. The State agrees as to the DNA collection fee, supervision fee, and jury demand fees but

maintains that the remaining fees and interest on restitution are moot because the obligations have been paid. Because the record does not establish that the issue is moot, we remand for the court to strike the challenged fees and exercise its discretion in whether to waive interest on restitution.

"As a general rule, [courts] will not decide moot questions or abstract propositions." *Hous. Auth. of City of Everett v. Terry*, 114 Wn.2d 558, 570, 789 P.2d 745 (1990). An issue is considered moot on appeal if the appellate court cannot provide effective relief. *In re Dependency of L.C.S.*, 200 Wn.2d 91, 98-99, 514 P.3d 644 (2022).

As of June 2018, a court " 'shall not order a defendant to pay costs if the defendant at the time of sentencing is indigent.' " *State v. Ramirez*, 191 Wn.2d 732, 748, 426 P.3d 714 (2018) (quoting LAWS OF 2018, ch. 269, § 6(3)). This "conclusively establishes that courts do not have discretion to impose such [legal financial obligations (LFOs)]" and applies prospectively to cases not yet final. *Ramirez*, 191 Wn.2d at 749.

In 2022, the legislature amended RCW 9.94A.703 to remove the requirement that a court order an offender to " '[p]ay supervision fees as determined by the [DOC].' " *State v. Wemhoff*, 24 Wn. App. 2d 198, 201, 519 P.3d 297 (2022) (first alteration in original) (quoting former RCW 9.4A.703(2)(d) (2018)). It also added a subsection to RCW 10.82.090, providing that a court "may elect not to impose interest on any restitution the court orders," directing the court to inquire into and consider a variety of factors in making that determination, including indigency. RCW 10.82.090(2).

22

And in July 2023, the legislature amended RCW 7.68.035 to prohibit the imposition of a VPA if the court finds a defendant indigent at the time of sentencing. The legislature also eliminated DNA collection fees. Recently amended RCW 43.43.7541 provides that the court shall waive any DNA collection fee previously imposed upon a motion by the defendant. These amendments apply retroactively to appeals that were pending when the amendments took effect. *State v. Ellis*, 27 Wn. App. 2d 1, 17, 530 P.3d 1048 (2023), *review granted*, 4 Wn.3d 1009 (2025).

Here, the State agrees to the removal of the DNA collection fee and community supervision fee. The State further agrees that imposition of a jury demand fee is not appropriate where the defendant had a bench trial. We remand for the trial court to strike those fees.

The State maintains, however, that the rest of the fees have been paid, rendering remand unnecessary concerning the VPA and restitution interest issues. The State asks this court to take judicial notice of the Whatcom County Superior Court docket in Odyssey as evidence of that payment, stating that the issues appear to be moot.

But given that the provided document does not make clear that Reed has in fact paid off the challenged LFOs or restitution, we cannot take judicial notice. Although the docket does include a list of payments and a total amount, none of the transactions provide any accounting of what fees the payments are credited toward. Because the record does not demonstrate that the challenged LFOs and interest have been paid in full, or that Reed would not be entitled to

23

reimbursement if the court were to waive interest he had already paid, the issue is not moot. And the State acknowledges that remand is an appropriate remedy for a non-moot issue. We remand for the trial court to strike the identified LFOs and exercise its discretion as to waiving interest.

We affirm the conviction for child molestation in the first degree but remand for the court to modify the community custody conditions, no-contact order, and fees.

WE CONCUR: